Filed 8/13/14  In re Nathan D. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Nathan D., a Person Coming Under the Juvenile Court Law. | |
| STEPHANIE D., Petitioner, v. THE SUPERIOR COURT OF LAKE COUNTY, Respondent, LAKE COUNTY DEPARTMENT OF SOCIAL SERVICES, et al. Real Parties in Interest. | A142172 (Lake County Super. Ct. No. JV320393) |

Stephanie D. has been incarcerated in Arizona for most of the life of her son, Nathan D.  When Nathan was an infant, Stephanie left him temporarily in the care of Tracy B., who obtained a court order in Arizona naming her Nathan's guardian.  Tracy refused to allow Stephanie contact with Nathan when she was not incarcerated and Stephanie did not know where they resided or how to contact them.  In 2011, an Arizona court revoked Tracy's appointment as guardian and in 2013, Tracy and Nathan moved to California.

Nathan was detained by the Child Welfare Service (CWS) of the Lake County Department of Social Services when Tracy was arrested.  Stephanie was informed and

1

expressed her interest in reuniting with Nathan when she is released from prison in June, 2015. The juvenile court sustained jurisdiction allegations and at a disposition hearing ruled that providing reunification services to Stephanie would be detrimental to Nathan. The court set a date for a hearing pursuant to Welfare and Institutions Code[1] section 366.26.

Stephanie contends that the juvenile court erred by denying her reunification services and has filed a petition for a writ of mandate to compel the Superior Court to (1) vacate its order setting a section 366.26 hearing, and (2) order that reunification services be provided. We issued an order to show cause.

We conclude that the juvenile court's determination that providing reunification services to Stephanie would be detrimental to Nathan was supported by substantial evidence and deny the petition.

## BACKGROUND

### I. *Nathan's and Stephanie's Background*[2]

Nathan was born to Stephanie in 2004 in Arizona He is now nine years old. Stephanie informed CWS that the alleged father, Joshua D., never provided support for Nathan. CWS was unable to locate Joshua.

Nathan has a number of half-siblings. The oldest is Houston D., now 18 years old and residing in Ohio. Emily W. is 15 years old and resides with her father in Arizona. Before giving birth to Nathan, Stephanie also had twin girls who were given up for adoption at birth.

Before Nathan was born, Stephanie had prearranged an adoption with Tamara A., who was present at Nathan's birth and whose last name appears on Nathan's birth certificate. When Nathan was born, Stephanie recanted the adoption agreement.

Stephanie has a criminal record dating back to July 14, 1997, with multiple arrests for offenses including possession of stolen vehicles, possession/sales of drugs, drug

---

[1] Unless otherwise indicated, all statutory citations are to the Welfare and Institutions Code.

[2] The personal background is stated from reports provided to the court by CWS.

paraphernalia, alien smuggling, and forgery. In a letter to a CWS social worker, Stephanie stated that she was on probation in 2005 and "[her] probation officer told [her] that [she] needed to put [her] kids, plus [her] sisters, into a temporary guardianship until [she] was back on track with probation." An acquaintance at her church, Tracy B., agreed "to do the temporary guardianship." On July 18, 2005, Tracy and her husband, Andrew E., filed a "[petition for permanent appointment of guardian of a minor]" in Maricopa County, Arizona. The petition stated that Nathan "will be continuing in our care until mother is able to get [him] back & support [him] in a stable safe environment."

When Stephanie finished a work furlough program, Tracy refused to return Nathan to her. Stephanie tried to locate Tracy, "but everytime [she] got close [Tracy] would up and move."

On March 17, 2006, the Superior Court of Maricopa County, Arizona appointed Tracy as Nathan's permanent guardian.[3] Stephanie maintains that she was never aware that a permanent guardianship of Nathan had been established and that she had no notice of the guardianship proceeding.

On November 21, 2006, Stephanie was sentenced to three years in prison for drug possession and was released in August 2009. According to Stephanie, Tracy sent her letters with pictures of Nathan during her incarceration, but the return address was a post office box, so she remained ignorant of their specific location. After her release, Tracy gave Stephanie her telephone number and they made arrangements to meet at a church so Stephanie could see Nathan. Tracy reneged on the meeting and disconnected her phone. Stephanie never knew where Tracy and Nathan were until she was contacted by CWS in connection with this case.

On March 9, 2010, Stephanie was sentenced to a prison term of four years and three months on a drug charge in Arizona. She was later convicted for "trafficking identity; attempt to commit; repetitive" and sentenced to five years and six months, to be

---

[3] Both Tracy and Andrew E., were appointed as guardians in 2006. However, at a guardianship review hearing in 2010, only Tracy was designated as a guardian.

served concurrently with her sentence for the drug conviction. Stephanie is currently incarcerated in Arizona and her earliest date of release is June 15, 2015. Release on that date will be under supervision, which will end on June 13, 2016.

## II. *The Juvenile Court Proceedings*

On January 27, 2014, Tracy, residing with Nathan in Clearlake, California,[4] was arrested on various charges not relevant to the petition before us. The police detained Nathan "due to having no legal caretaker available and due to questions regarding the identities and relationship between [Tracy] and the minor." On January 29, 2014, CWS filed a juvenile dependency petition, pursuant to Welfare and Institutions Code section 300.

The juvenile court held a detention hearing on January 30, 2014. Tracy was present, in custody, and counsel was appointed to represent her. Separate counsel was appointed to represent Nathan. The court ordered Nathan detained.

CWS filed a jurisdiction report on February 20, 2014, and the juvenile court held a jurisdiction hearing on February 24, 2014. Stephanie was present by telephone. The court appointed counsel for Stephanie and continued the hearing.

On March 21, 2014, Tracy, in custody, and Stephanie, by telephone, were present. Counsel for CWS and for Stephanie objected to Tracy's presence, challenging her status as Nathan's guardian, based on information in the jurisdiction report. The court questioned Tracy, who continued to maintain that she was Nathan's guardian and was in the process of obtaining proof from Arizona. The hearing was continued so that Tracy's status could be resolved.

On April 4, 2014, CWS filed a supplemental report, concluding that Tracy's guardianship of Nathan was terminated in Arizona on September 25, 2011 and that Tracy had no standing in the dependency proceedings.

---

[4] Tracy later told the juvenile court that she moved to California with Nathan in January 2013.

4

On April 7, 2014, Stephanie was present by telephone. Tracy was not present and the matter of her status was continued to give CWS time to obtain proof that her guardianship was terminated in 2011.

On April 28, 2014, Tracy, now out of custody, was present. Stephanie was present by telephone. Tracy maintained that she could obtain documentation, dated after September 25, 2011, showing that she remained Nathan's guardian. The juvenile court again continued the matter, but told Tracy that she had the burden of production and, absent additional proof, the court would rule that she had no standing in the proceedings.

On May 1, 2014, CWS filed a supplemental report, again concluding that Tracy had no standing.

On May 7, 2014, Stephanie was present by telephone. She agreed not to contest the matter of jurisdiction and to submit on the CWS report. Tracy was not present and the court determined that she was not Nathan's legal guardian and she had no standing to appear in the dependency proceedings. By a preponderance of the evidence, the court found true jurisdiction allegations pursuant to section 300, subdivisions (b) (failure to protect) and (g) (no provision for support).[5]

On May 23, 2014, CWS filed a disposition report. The report noted that Stephanie desires reunification with Nathan and had been cooperative with CWS. During her incarceration, Stephanie has received a G.E.D. and has taken classes and courses including parenting, cognitive/addiction and behaviors, domestic violence, and graphic arts. She attends 12-step meetings once or more per week. She works in the prison print shop five days a week and receives excellent work reviews. After discharge, she plans to

---

[5] The section 300, subdivision (b), allegation was: "The biological mother, Stephanie D[.], has significant criminal history including, but not necessarily limited to, unlawful use of mean of trns [*sic*], dangerous drug violation; danger/repetit/enhance [*sic*], and trafficking identity; attempt to commit; repetitive, which Ms. D[.] is currently serving time for at the Arizona State Prison Complex—Perryville."

The section 300, subdivision (g), allegation was: "The biological mother, Stephanie D[.], has not been providing regular care for her child, Nathan D[.]. Ms. D[.] is currently incarcerated at the Arizona State Prison Complex—Perryville. Ms. D[.]'s admission date was 06/25/10 and her current release date is 06/15/15."

live with a long time friend in Phoenix, Arizona.  Alternately, she has also considered entering a halfway house in Phoenix.

According to the report, Stephanie could not identify any of Nathan's relatives who would be capable of caring for him.  Nathan's maternal great grandmother stated that she could not care for Nathan due to her age and health issues.  Nathan's half-brother, Houston, was interested in obtaining guardianship of Nathan in the future, but was not financially capable of doing so at present. The great grandmother and Houston have been corresponding with Nathan by letters, cards and photographs.  Nathan has also had one supervised phone call with Houston.

Nathan was placed in a foster home on January 27, 2014.  His foster mother states that "Nathan is a sweet, polite, child with no notable behavioral problems.  He follows her directions and is not exhibiting resistance to any directions given to him."

The report states that when Nathan was asked what he would like regarding placement, he first replied that he wished to return to the care of his "mother," referring to Tracy.  Nathan's next suggestion was his maternal great grandmother, with whom he had spoken once on the telephone and from whom he recently received a letter.  Nathan's third suggestion was to live with Stephanie.  In another interview, Nathan stated that he wanted to live with his "brother Chris," referring to Tracy's son.  It appeared to the social worker that Nathan was "interested in finding some family connection and wishes to know his maternal family members."

The report stated that Nathan is "developmentally on track for his age."  Nathan's third grade teacher believes that his "skills are below the medium."  The teacher "questions how much school history Nathan has, because when she asks him to do a simple project, which she would expect a child his age to perform, he often looks 'perplexed and/or mystified.' "  The teacher reported that Nathan has "great manners which is above his peers."  Nathan's test scores show that he is "mid-level in [r]eading and fairly low level in [g]eometry."  The teacher reported that Nathan "speaks freely about his foster mother and how much he likes her and being in her care."

The report states CWS's belief that ordering reunification services to Stephanie would be detrimental to Nathan because it would prevent him "from obtaining his right to permanency and to placement in the least restrictive and most family like setting possible." As reasons for this assessment, the report lists the following: (1) at Nathan's birth, Stephanie planned to give him up for adoption; (2) Stephanie had been incarcerated for most of Nathan's life and had not demonstrated an ability to consistently parent any of her children; (3) Nathan has no memory of his mother and no bond exists; (4) Stephanie's earliest release date is June 15, 2015, so that "[i]f an extension of reunification services were ordered, six-months beyond the 12-month limitation, the likelihood of establishing reunification by the 18-month review hearing on 07/30/2015, is minimal"; (5) based on Stephanie's release date, the likelihood of her successfully establishing a place of residency and sufficient services to meet her needs and that of a child by the 18-month review hearing is minimal; and (6) Stephanie had already completed extensive services during her incarceration which had not eliminated the current circumstances that led to Nathan's removal and it is unlikely that these same services provided through reunification services would create substantial change in the circumstances.

The report concludes with a recommendation that reunification services not be ordered for Stephanie and that the court set a section 366.26 permanency planning hearing. The case plan recommended contact by letter with Stephanie and other family members.[6]

On June 2, 2014, the juvenile court held a disposition hearing. Stephanie was present by telephone and her counsel requested that the court grant her reunification services. Counsel conceded that Stephanie's release date "is very near the 18-month date" but noted that "there is a new law that allows the court to continue services for up to 24 months if certain requirements are met . . . ." Counsel also informed the court that

_____

[6] At the disposition hearing on June 2, 2014, upon the request of Stephanie's counsel and without objection by CWS, the court allowed telephone contact between Stephanie and Nathan as deemed appropriate by CWS.

the previous Friday Nathan told a schoolmate that he was going to be picked up that afternoon by " 'his real mom' " and did not return to his foster home that day. Tracy could not be reached and it was assumed that she had taken Nathan.[7] Counsel argued that this "mirrors what [Stephanie] has previously experienced. Her ability to have a relationship with Nathan has been thwarted by the former guardian."

Stephanie's counsel argued further that Stephanie and Nathan "have just started forming a relationship, and . . . within these next 18 months possibly 24 months, there's a chance to continue to nurture that and for him to be able to stay in contact and know his family. There is a possibility to be able to reunite this mother with her son . . . ." Counsel also asked the court not to consider the fact, cited in the disposition report, that before his birth, Stephanie had agreed to give Nathan up for adoption. He argued that the fact was not relevant because Stephanie did not follow through with adoption "and if we held every parent to that standard then we would likely be not . . . offering services to a lot of people."

The juvenile court stated that "the one thing that's most troubling" was that "for eight years of [Nathan's] life, [Stephanie has] not been in on it while she's been incarcerated for things she did. That weighs heavy in the court's mind in looking at this."

Nathan's appointed counsel also urged the court to order reunification services for Stephanie because Nathan has, "through the actions of [Tracy], found himself here in Lake County away from Arizona, away from family, away from grandparents or great grandparents that care about him. It seems odd to me that we would be moving towards basically, without even trying, to take him away from his family."

In addition to the disposition report, the court also considered a letter from Stephanie, commenting that "it shows a lot of good progress made by the mother. And if you accept it at face value, she is determined to change her life. Part of the difficulty here though is she's going to have a very tough time of it just to take care of herself upon her

---

[7] On June 6, 2014, CWS updated the court that Nathan and Tracy had been located in Utah. Nathan was again in CWS custody and Tracy had been arrested.

initial release, let alone properly parent a child who at that time would be in the neighborhood of 10 or 11 years old or be ready even six months after release."

The juvenile court found that providing reunification services to Stephanie would be detrimental to Nathan. The matter was set for selection and implementation of a permanent plan, pursuant to section 366.26, on August 25, 2014.

On June 10, 2014, Stephanie timely filed a notice of intent to file a writ petition. The petition for extraordinary writ and a request for a stay of all proceedings was filed on July 11, 2014. On July 15, 2014, we issued an order to show cause why the petition should not be granted and we stayed the section 366.26 hearing pending further order.

## DISCUSSION

Stephanie contends that the juvenile court erred by denying her reunification services. She seeks a writ of mandate compelling the Superior Court to vacate its order setting a section 366.26 hearing and to order that reunification services be provided.

"We review the court's decision to deny reunification services under the substantial evidence test to determine whether it is supported by evidence that is reasonable, credible, and of solid value. [Citation.] 'We do not reweigh the evidence, nor do we consider matters of credibility.' " (*L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285, 1292.) "[W]e presume 'in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' " (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164.)

When a child has been removed from the custody of a parent or guardian, the juvenile court is generally required to order family reunification services to the child's mother. (§ 361.5, subd. (a).) When the child is, like Nathan, over the age of three years, "court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care . . ., unless the child is returned to the home of the parent or guardian." (§ 361.5, subd. (a)(1)(A).) Services may be extended "up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of his or her parent or guardian if it

9

can be shown, at the hearing held pursuant to subdivision (f) of Section 366.21, that the permanent plan for the child is that he or she will be returned and safely maintained in the home within the extended time period.  The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian." (§ 361.5, subd. (a)(3).)

If the reunification services have been extended to 18 months and the child is not reunified with the parent within that time period, then reunification services may again be extended to 24 months if "the court determines by clear and convincing evidence that the best interests of the child would be met by the provision of additional reunification services to a parent or legal guardian who is making significant and consistent progress in a court-ordered residential substance abuse treatment program, or a parent recently discharged from incarceration . . . and making significant and consistent progress in establishing a safe home for the child's return." (§ 366.22, subd. (b).)  "If the court extends the time period [to 24 months], the court shall specify the factual basis for its conclusion that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period." (§ 361.5, subd. (a)(4).)

Even if the parent is incarcerated or institutionalized, the juvenile court must still order reasonable reunification services "unless the court determines by clear and convincing evidence, those services would be detrimental to the child.  In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime or illness, the degree of detriment to the child if services are not offered and, for children 10 years of age or older, the child's attitude toward the implementation of family reunification services, the likelihood of the parent's discharge from incarceration . . . within the reunification time limitations described in subdivision (a), and any other appropriate factors." (§ 361.5, subd. (e)(1).)

The juvenile court determined that ordering reunification services for Stephanie would be detrimental to Nathan. Accordingly, we examine the relevant[8] section 361.5, subdivision (e)(1), factors to determine if substantial evidence supports the court's ruling.

**The age of the child.** Nathan is nine years old and will be eleven years old within six months of Stephanie's release from prison. It is in Nathan's interest now to form a bond of trust with a person exercising the role of parental authority and who has the resources to respond to his needs before he enters his teen years. The trial court reflected this interest when it stated: "Part of the difficulty here though is [Stephanie's] going to have a very tough time of it just to take care of herself upon her initial release, let alone properly parent a child who at that time would be in the neighborhood of 10 or 11 years old or be ready even six months after release." This factor weighs against ordering services, based on Stephanie's time of release, which is supported by substantial evidence.

**The degree of parent-child bonding.** Nathan has no memory of Stephanie and, before this case commenced, there had been no contact between them for seven or eight years. Even though some bond might have been formed but for the wrongful acts of Tracy, substantial evidence supports a finding that this factor weighs against ordering services for Stephanie.

**The length of the sentence**. Stephanie is currently serving a sentence of five years and six months. Stephanie had previously served a three-year sentence and was out of custody for only about seven months between the two sentences. Even if she had been able to maintain some contact with Nathan, she has been absent as a caretaker and parental authority for most of Nathan's life. Substantial evidence supports a finding that this factor weighs against ordering services for Stephanie.

---

[8] The irrelevant factors here are the child's attitude toward the implementation of reunification services (because that factor applies only for children 10 years of age or older) and the length and nature of the treatment (because we read this factor as applying to "institutionalized" parents, who are also covered by section 361.5, subdivision (e)(1), and not to incarcerated parents.)

11

**The nature of the crime or illness**.  Stephanie is currently incarcerated for a drug violation and for identity trafficking.  Stephanie's criminal history relating to drug use dates back to 1999.  While Stephanie had made admirable efforts while incarcerated to attain the personal insight and vocational skills necessary to maintain herself in society without committing further offenses, she has yet to demonstrate an actual ability to do so.  In order to reunify with Nathan, Stephanie would have to demonstrate her ability to maintain a home environment, free from drug use, that would be safe for Nathan and, as we discuss below, this does not appear to be reasonably possible within the statutory time limits.  Accordingly, this factor weighs against ordering reunification services and is supported by substantial evidence.

**The degree of detriment to the child if services are not offered.**  In her petition, Stephanie argues that "[n]ot allowing [her] a chance to reunify will result in permanently cutting off [Nathan's] connection with his family, a family he has wrongfully been deprived of."  She further contends:  "Reunifying [Nathan] with his mother is the only means for [Nathan] to have a meaningful connection with the family he lost when he was only two years old."  Stephanie overstates the detriment to Nathan if services are not offered because contact with Stephanie and Nathan's other relatives is not "permanently cut[] off" in that case.  The court's order permits contact by letter between Nathan and Stephanie, Houston, and his maternal great grandmother.  Telephone contact between Nathan and Stephanie is permitted if CWS deems such contact appropriate.

Whatever permanent plan is adopted at a section 366.26 hearing and whatever the consequent impact that might have on Stephanie's parental rights, communication between Nathan and his relatives need not necessarily be terminated.  Considering that there is no current parental bond between Nathan and Stephanie and considering the interest in providing permanence to Nathan as he enters his second decade, there is no evidence of significant detriment to Nathan if reunification services are not offered.  This factor weighs against ordering reunification services.

**The likelihood of the parent's discharge from incarceration within the reunification time limitations.**  As we have noted, when a child is, like Nathan, older

12

than three years, a parent is generally permitted 12 months of reunification services, and that may be extended to 18 months if, at 12 months, it can be shown "that the permanent plan for the child is that he or she will be returned and safely maintained in the home within the extended time period." (§ 361.5, subd. (a)(3).)

The 18-month period commences with the date the minor entered foster care. In this case, the initial detention order was filed on January 30, 2014, and the 18-month period expires on July 30, 2015. Stephanie's earliest release date from incarceration is June 15, 2015, only six weeks before the 18-month period expires. Stephanie's post-release plans are to live with a friend in Phoenix or to enter a halfway house. Like the trial court, we fail to see how, within six weeks of release, Stephanie could demonstrate her ability to provide the care Nathan needs in a safe place of residence so that reunification could actually take place at that point.

At the disposition hearing and in her petition, Stephanie argues that we should take into account the possibility, under sections 361.5, subdivision (a)(4) and 366.22, subdivision (b), that the time period might be extended to 24 months. However, in order to be granted the additional six months of reunification services, Stephanie would have to demonstrate by clear and convincing evidence at the 18-month point, six weeks after her release, that she had made "significant and consistent progress in establishing a safe home for [Nathan's] return." (§ 366.22, subd. (b).) There is no evidence, and no reasonable likelihood, that Stephanie would be able to demonstrate significant and consistent progress within six weeks of her release.

As noted in *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1030-1031 (quoting Seiser & Kumli, Cal. Juvenile Court Practice and Procedure (2012) § 2.129[2][b], pp. 2-390 to 2-391, italics added): " '[T]here are many cases in which the provision of . . . services has little or no likelihood of success and thus only serves to delay stability for the child, particularly if the incarcerated parent is the only parent receiving services. This is especially true when the parent will be incarcerated longer than the maximum time periods for reunification efforts. . . . Indeed, *to attempt services in such circumstances may be setting everyone up for failure, including the parent,*

13

*agency, and child.* Thus, in cases such as these, it may be possible to show that providing services to the incarcerated parent would be detrimental to the child since it would delay permanency with no likelihood of success.' "

Given that Stephanie's release date is so close to the 18-month point, substantial evidence supports a conclusion that this factor weighs against providing reunification services.

**Any other appropriate factors**. On this factor, Stephanie argues as follows: "What has happened to [Nathan] is a travesty. He has been taken away from not only his mother, but other biological family members as well. The most important factor is that [Nathan] was essentially kidnapped from his family, and later kidnapped from his foster placement by the same individual. Because [Tracy] cut-off all contact with [Stephanie] and ran off with [Nathan], [Stephanie] was not able to place [Nathan] in suitable care during her current incarceration, which at least under California law would not have risen to the level to detain [Nathan] in the first place. [Tracy] has committed a great wrong that needs to be righted. The only way to do so is to allow [Nathan] to have the opportunity to reunify with his mother."

We agree that Tracy committed a great wrong against both Stephanie and Nathan and that consideration of that wrongdoing weighs in favor of ordering reunification services. Nevertheless, even though Tracy contributed to the current state of affairs, so did Stephanie with the criminal acts that resulted in her lengthy incarceration. It was the duty of the court to consider the best interests of Nathan in the current state of affairs, whatever its cause—not to right the wrongs that created that state of affairs.

Stephanie concludes her examination of the factors by, in essence, asking us to ignore the proper standard of review: "In looking at the balance of the factors, there is not clear and convincing evidence that it would be detrimental to [Nathan] to offer services to [Stephanie]." On review, we do not reweigh the factors. We simply ask if substantial evidence supports the determination of the juvenile court. Here, substantial evidence supports a determination that most of the relevant factors weigh against the provision of reunification services to Stephanie.

14

## DISPOSITION

The petition for extraordinary writ relief is denied on the merits. (Cal. Rules of Court, rule 8.452(h)(1).) The stay of the section 366.26 hearing is lifted. This decision is final as to this court immediately. (*Id.*, rule 8.490(b)(2)(A).)

_____

Brick, J.*

We concur:

_____

Kline, P.J.

_____

Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.